## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| Saul Diaz, | ) | |
| | ) | |
| Plaintiff, | ) | No. 09 C 01649 |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | Judge Edmond E. Chang |
| Elgin School District #U-46, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Saul Diaz filed this lawsuit against his former employer, Elgin School District U-46, alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.*, the Civil Rights Act of 1866, 42 U.S.C. § 1981, the Family and Medical Leave Act, 29 U.S.C. § 2061 *et seq.* (FMLA), and the Americans with Disabilities Act, 42 U.S.C. § 12101 *et. seq.* (ADA). Diaz claims that he was disciplined and eventually terminated based on his natural origin, disability, and exercise of his FMLA rights. The School District has moved for summary judgment. R. 52.[1] For the reasons stated below, the motion is denied in part and granted in part.

## I.

Saul Diaz was hired by the School District in September 1998. R. 55 ¶ 9. During his employment, Diaz held the positions of relief custodian, head custodian, and "night

---

[1]Citation to the docket is "R." followed by the entry number and, when necessary, the page/paragraph number.

lead." *Id.* ¶ 11. In 2001, Diaz's manager, Manuel Figueroa, was replaced by Cathy McNamara, who would become his new boss. *Id.* ¶¶ 10, 11, 14.

Throughout his employment, Diaz had work performance issues. At Diaz's first job (which was "relief custodian"), a number of managers, administrators, and co-workers complained about his work performance. *Id.* ¶ 12. For example, in March 2000, Figueroa (Diaz's then-manager) suspended Diaz without pay for five days based on several concerns, including "[d]efacing" various documents belonging to the head custodian and poor work performance. *Id.* ¶ 13; R. 56, Exh. 31.

At his second job, as head custodian at Sunnydale Elementary School, the principal complained to McNamara (his then-manager) about Diaz's performance. R. 55 ¶ 17. The following year, McNamara received another set of complaints from the next principal of the school. *Id.* ¶ 18. McNamara decided to move Diaz to Larkin High School, where he was placed as the "Night Lead" because this position required less personal interaction. *Id.* ¶ 20.

Yet the complaints still persisted. Bob Adamik, the head custodian at Larkin, complained that Diaz was not following instructions or completing assignments. *Id.* ¶ 27. On November 1, 2007, McNamara met with both Diaz and Adamik, and following the meeting, it was agreed that Diaz's cleaning duties would be reduced by half so that he could have more time to complete maintenance and other assignments. *Id.* According to Diaz, a "racist and discriminatory culture exposed itself" during this time. R. 58 at 2. Diaz was referred to as "spic" and "wetback," and Adamik allegedly said

that he loved firing Mexicans and that he would create a paper trail to get Diaz fired. R. 59 ¶ 9.

On November 28, 2007, Larkin High School Assistant Principal Lori Rollins sent an e-mail to McNamara regarding Diaz's repeated failure to respond to walkie-talkie calls and to the public address system. R. 55 ¶ 28. On that particular day, Rollins was unable to locate Diaz, and after she finally did, she had to remind him about responding to radio calls for assistance. *Id.* Diaz also failed to properly set up rooms for events, to carry his radio, and to answer calls. *Id.* ¶ 29.

Around a week later, on December 5, Diaz met with McNamara and union steward Mitch Cain to discuss these issues, and a month later, Diaz received a written warning. *Id.* ¶ 29. In January 2008, Diaz filed a discrimination charge with the EEOC based on this written warning. R.1, Exh. A at 2-3.

In February 2008, Rollins sent McNamara another e-mail, detailing additional concerns about Diaz's performance. R. 55 ¶ 31. On February 4, Diaz was late in addressing a problem relating to the fire alarm, causing the building to be without fire-alarm protection overnight. *Id.* ¶ 32. On February 25, various school employees reported that school doors had been left open overnight. *Id.* ¶ 33. On February 27, Diaz failed to complete a set-up in the cafeteria for an important recognition breakfast. *Id.* ¶ 34. Shortly afterwards, McNamara, Cain, and Rollins met with Diaz, and on March 31, Diaz was suspended without pay for five days. *Id.* ¶ 37. Diaz then filed a second EEOC charge, based on this suspension. R.1, Exh. A at 3-4.

On April 28, 2008, Diaz went on approved FMLA leave for complications due to his diabetes. R. 55 ¶ 41; R. 1 ¶¶ 32-34. He was scheduled to return from leave on May 22, 2008. *Id.* A week before he was scheduled to return, however, McNamara requested to meet with Diaz to address certain problems with his job performance. *Id.* ¶ 42. On May 22, the day he returned from leave, Diaz learned that he was being suspended without pay for ten days. *Id.* ¶ 44. Diaz complained to McNamara that "this is not fair . . . I've been harassed." R. 58, Exh. G1 at 77. According to Diaz, McNamara then said, "spic, nothing's going to happen after this." *Id.* Diaz contends that she then went on to say that "go[ing] to court" would not matter because the School District had "plenty of money" and "good attorneys." *Id.*

Diaz also had a run-in with Adamik, the school's head custodian. It occurred during the afternoon of June 17, 2008. R. 55 ¶ 47. As McNamara walked into the room, she witnessed Diaz standing over Adamik (who was sitting in a chair) while shouting at Adamik. *Id.* ¶ 48. Diaz's arm was behind him and McNamara thought Diaz was about to punch Adamik. *Id.* As soon as Diaz saw McNamara, he immediately left the scene. *Id.* Following the incident, McNamara told both Diaz and Adamik to give her statements describing what happened. *Id.* ¶ 49. Adamik wrote a report, saying that he believed Diaz was going to hit him. *Id.* ¶ 51. Joseph Ruiz, a witness to the incident, corroborated Adamik's account. *Id.* ¶ 52. Diaz, however, failed to submit a statement. *Id.* ¶ 53. Afterwards, McNamara, along with other administrators, recommended to the Board of Education that Diaz be fired. *Id.* ¶ 53.

On June 23, a termination hearing was held, and Diaz presented a statement describing his perspective on the altercation. *Id*. ¶ 54. McNamara was unmoved by his statement and continued to recommend termination. *Id*. A month later, after reviewing Diaz's entire file, the Board of Education approved Diaz's termination. *Id*. ¶ 57. Diaz filed an administrative grievance, which was reviewed by the Board of Education and denied. *Id*. ¶¶ 59-60.

On December 18, 2008, the EEOC issued Diaz two right-to-sue letters based on the charges he filed earlier that year. R.1, Exh. B. Three months later, Diaz filed a nine-count complaint alleging violations of Title VII, Section 1981, the Americans with Disabilities Act, and the Family Medical Leave Act. R.1. The School District moved for summary judgment, R.52, and the matter is now fully briefed before this court.

## II.

Summary judgment must be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323,

(1986). After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.' " *Anderson*, 477 U.S. at 255 (quoting Fed R. Civ. P. 56(e)).

### III.

Generally, a Title VII plaintiff may bring only those claims that were included in the EEOC charge. *Cheek v. Western & Southern Life Ins. Co.*, 31 F.3d 497, 501 (7th Cir.1994). A plaintiff may also bring a claim that is "like or reasonably related to the allegations of the charge and growing out of such allegations." *Moore v. Vital Products Inc.*, 641 F.3d 253, 256-57 (7th Cir. 2011) (citing *Jenkins v. Blue Cross Mut. Hosp. Ins.*, 538 F.2d 164, 167 (7th Cir. 1976)) The Seventh Circuit has held that this standard is met "if there is a reasonable relationship between the allegations in the charge and the claims in the complaint, and the claim in the complaint can reasonably be expected to grow out of an EEOC investigation of the allegations in the charge." *Cheek*, 31 F.3d at 501. The purpose of this rule is to allow the EEOC and the employer to

> settle the dispute through conference, conciliation, and persuasion, and . . . [to] giv[e] the employer some warning of the conduct about which the employee is aggrieved.

*Id.* at 500 (citations omitted). "Although the rule is not jurisdictional, it is a condition precedent with which Title VII plaintiffs must comply. For allowing a complaint to encompass allegations outside the ambit of the predicate EEOC charge would frustrate the EEOC's investigatory and conciliatory role, as well as deprive the charged party of notice of the charge." *Id.*

Because the EEOC charge is often completed by laypersons rather than lawyers,"a Title VII plaintiff need not allege in an EEOC charge each and every fact that combines to form the basis of each claim in her complaint." *Id.* Diaz filed two EEOC charges: (1) in January 2008, alleging national origin and ADA discrimination for a warning he received from his supervisor; and (2) in April 2008, alleging retaliation based on a five-day suspension. Diaz may proceed on all claims relating to these two charges. But the question is whether any additional claims may proceed, specifically, those claims that are based on facts not specifically alleged in the EEOC charges. This is an important question because the bulk of any damages would arise from Diaz's firing and hostile work environment claims, rather than from a warning or a five-day suspension.

Plaintiffs may proceed on claims that are not included in an EEOC charge if the proposed claims are "like or reasonably related" to those contained in the EEOC charge. *Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 602 (7th Cir. 2009). "[C]laims are not alike or reasonably related unless there is a factual relationship between them. This means that the EEOC charge and the complaint must, at minimum, describe *the same conduct and implicate the same individuals*." *Cheek*, 31 F.3d at 501 (emphasis added). As described below, Diaz's Title VII and Section 1981 counts include (1) hostile work environment / harassment claims and (2) discriminatory discharge claims that involve facts not alleged in the EEOC charges.

## A.      Hostile Work Environment & Harassment

Diaz's hostile work environment claims are based on two facts: (1) the frequent use of racial epithets and discriminatory statements by his co-workers Bob Adamik and Joe Creadon; and (2) McNamara's failure to act after she learned of Bob Adamik's offensive behavior. R. 59 ¶¶ 9-13, 18. Diaz argues that because there is a genuine issue of fact over whether there was a hostile work environment, this Court cannot grant the School District's motion for summary judgment. R. 58 at 14-15. But this argument does not address the threshold issue of whether a hostile work environment claim can be brought at all. The presence of a genuine issue of fact is relevant only *after* Plaintiff has established that he met the EEOC-charge requirement. To do that here, the Court asks whether the facts underlying the hostile work environment claims are reasonably related to those in the EEOC charges.

The EEOC charges mention neither Adamik nor Creadon, so any claims based on their alleged conduct cannot proceed because the same individuals are not implicated. The EEOC charges do contain allegations against McNamara, but the charges do not describe the same or related conduct. R.1, Exh. A at 2-5. The first EEOC charge alleged that McNamara treated Diaz and Rob Schweig – a similarly situated employee who ostensibly also had work performance issues – differently because only Diaz received a written warning. R.1, Exh. A at 2-3. In the second EEOC charge, Diaz alleged that a five-day suspension imposed by McNamara was in retaliation against him for filing the first EEOC charge. *Id.* at 4-5.

In contrast, the hostile work environment claims deal with McNamara's failure to address Adamik's offensive behavior. This accusation – the failure of supervisor to address the discriminatory behavior of a subordinate – is not the same conduct as treating subordinate employees differently. Nor is it the same conduct as retaliating against an employee for filing an EEOC charge.

The "reasonably related" exception[2] was created to allow plaintiffs to pursue claims without succumbing to "procedural technicalities." *McKenzie v. Illinois Dept. of Transportation,* 92 F.3d 473, 482 (7th Cir. 1996). But in this case, the EEOC never had a chance to examine McNamara's alleged failure to address a subordinate's racially offensive behavior. Nor did the EEOC have the chance to investigate the racially offensive remarks allegedly made by Adamik and Creadon. Under these circumstances, failing to alert the EEOC of these allegations is not a mere overlooked procedural technicality, but rather undermined the EEOC-charge requirement. Accordingly, Diaz cannot proceed on his hostile work environment and harassment claims.

## B.    Discriminatory Discharge

The School District also argues that Diaz cannot proceed on any of his discharge claims (besides those based on the FMLA) because they do not involve the same conduct or individuals contained in the EEOC charge. R. 54 at 8. Diaz counters with two arguments. First, he argues that there is a genuine issue of fact over whether his

---

[2]Perhaps more precisely, the "reasonably related" doctrine is not an 'exception' to the EEOC-charge requirement as much as it is an interpretation of what claims should be considered as falling within a filed charge.

firing was discriminatory or retaliatory. R. 58 at 14-15. This argument again is not responsive to the EEOC-charge requirement argument. Second, Diaz argues that the underlying facts – namely, the decision to fire him – are reasonably related to those contained in the EEOC charges. R. 58 at 4.

Diaz cites *Long v. American Medical Association*, 2004 WL 1088229, at *8 (N.D. Ill. May 14, 2004), for the proposition that an allegation of discrimination contained in an EEOC charge is reasonably related to a termination claim. R.58 at 4-5. But the facts there are not analogous. It is true that, in *Long*, the plaintiff filed a lawsuit alleging discriminatory discharge without a corresponding EEOC charge. *Long,* 2004 WL 108829, at *3. But there the plaintiff filed numerous EEOC charges, including a charge that her termination was due to retaliation. The court in *Long* found that the retaliation charge and the discriminatory firing charge were related because

> the complaint of race discrimination in her termination implicates the *same actors* (primarily Payerli, but also Rhodes, Evans, and Musacchio) and the *same conduct* (termination) as the retaliation claim in her EEOC charge.

*Id.* at *8 (emphasis added). There, the EEOC had an opportunity to investigate the termination allegations, and the employer received notice of the plaintiff's termination claims. Not so here. The only claims for which the School District received notice were the claims relating to the warning and the suspension – not the firing. To be sure, the EEOC charges and the termination claims involve the same supervisor (McNamara) and the warning and suspension might have contributed to Diaz's firing, but the June 2008 altercation also played a key role in the decision to terminate. R. 55 ¶ 53. That

altercation directly involved Bob Adamik, who, as discussed earlier, was not mentioned in the EEOC charges at all. Because the facts in the EEOC charges and the discriminatory firing claims involve different conduct and different individuals, they are not reasonably related. Therefore, Diaz cannot move forward on those claims.

## IV.

The Court will now address the discrimination and retaliation claims, limited to the warning and five-day suspension. Generally, the same principles apply to race discrimination claims under Title VII as under 42 U.S.C. § 1981. *Swearnigen–El v. Cook County Sheriff's Dep't*, 602 F.3d 852, 860 n. 6 (7th Cir.2010); *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 403-04 (7th Cir.2007); *Davis v. Wis. Dep't of Corrections*, 445 F.3d 971, 976 (7th Cir.2006). Because the liability standards under Title VII and Section 1981 are the same, the Court will group together the discussion of Diaz's race discrimination claims under both statutes. *See Herron v. DaimlerChrysler*, 388 F.3d 293, 298 (7th Cir. 2004).

### A.    Race Discrimination

#### 1.    Indirect Method

To avoid summary judgment on his race discrimination claim, Diaz may use either the direct method or indirect method of proof pursuant to the familiar *McDonnell-Douglas* framework. *See Naik v. Boehringer Ingelheim Pharm.*, 627 F.3d 596, 599 (7th Cir. 2010); *Egonmwan v. Cook County Sheriff's Dep't*, 602 F.3d 845, 849-50 (7th Cir. 2010). Under the indirect method, Diaz must first show that (1) he is a

member of a protected class; (2) his job performance met the School District's legitimate expectations; (3) he suffered an adverse employment action; and (4) the School District treated similarly situated individuals outside of his protected class more favorably. *Egonmwan*, 602 F.3d at 850; *Swearnigen–El*, 602 F.3d at 860. If Diaz establishes these four prima facie elements of race discrimination, the burden then shifts to the School District to offer a legitimate, nondiscriminatory reason for the adverse employment action. *Naik*, 627 F.3d at 600. If the School District meets this burden, Diaz must demonstrate that the proffered reasons are pretext for discrimination. *Egonmwan*, 602 F.3d at 850.

The parties do not dispute that Diaz was a member of a protected class or that he suffered an adverse employment decision. The School District argues, however, that Diaz's job performance did not meet legitimate expectations. Indeed, the record is filled with examples of Diaz's poor work performance. He failed to secure doors, left the school grounds during his workday, failed to set up for events, and failed to fix the fire alarm. R. 55 ¶¶ 32-40. Diaz counters by arguing that he was given a promotion to Night Lead, which suggests that he was an exemplary employee. R. 58 at 13. Diaz also points out that McNamara "felt that he was competent, trustworthy, reliable, and fully capable of handling a much more difficult job than his prior job." *Id.* Diaz also cites, as proof of his good work performance, a job offer he was given by McNamara during the spring of 2008, shortly before he was fired. *Id.*

But the evidentiary record, even when viewed in Diaz's favor, does not support his contentions. First, Diaz received the job offer in the spring of 2008 not because he

was a strong employee but because he had complained about his job dissatisfaction at Larkin High School. R. 55 ¶ 46. Second, Diaz became Night Lead at Larkin because he was transferred from his previous position due to numerous complaints by the school's principal. *Id.* ¶ 17. Third, McNamara's comments that Diaz was a capable employee were made *before* he was transferred to Larkin High School, and thus have little bearing on his job performance while at Larkin. R. 58, Exh. A at 188. Fourth, Diaz's contention that he performed well at his job is refuted by the warning and two suspensions he received that reflected serious work-related deficiencies. Therefore, Diaz has not shown that he was meeting the School District's legitimate expectations.

Nor does Diaz have sufficient evidence, even when viewed in the light most favorable to him, that a similarly situated employee was treated better than he was. Diaz presents Robert Schweig, the head custodian of Larkin High School. R. 59 ¶ 15. According to Diaz, Schweig – a Caucasian male – failed to fix a bathroom that was in disrepair, yet Schweig escaped any formal complaints, warnings, suspension, or other discipline. R. 59 ¶¶ 16-17. But Diaz overlooks the fact that his own transgressions were far more serious than failing to fix a bathroom. Not only did Diaz fail to properly respond to calls, carry his radio, or perform certain setups, he failed to secure the school building's door on more than one occasion. R. 55 ¶¶ 33, 38. Such failure created a serious security risk for the school. Putting student safety at risk is not comparable to failing to clean a bathroom. Diaz has not presented evidence indicating that Schweig committed any similarly grievous errors with regard to his job duties. Thus, Schweig is not a similarly situated employee.

But there still remains the direct method of proof. Under the direct method, a plaintiff must present direct or circumstantial evidence that creates a "convincing mosaic of discrimination" on the basis of race. *Winsley v. Cook County*, 563 F.3d 598, 604 (7th Cir. 2009) (citing *Troupe v. May Dep't Stores*, 20 F.3d 734, 737 (7th Cir. 1994). Diaz presents several pieces of evidence: first, Creadon and Adamik allegedly made a number of racially offensive comments. R. 59 ¶¶ 12-13 . Second, Adamik singled out Diaz by keeping a log of his mistakes in order to get him fired. *Id.* ¶ 14. But discrimination by his co-workers do not, by themselves, have any bearing on whether racial animus motivated McNamara in issuing the warning or the suspension. Thus, these two examples cannot be part of a "convincing mosaic of discrimination."[3]

With regard to McNamara, Diaz first avers that McNamara suspended him after the altercation with Bob Adamik without hearing his side of the story. R. 59 ¶ 30. Diaz also avers that McNamara misrepresented the reasons why Diaz was fired. *Id.* at 11-12. These two facts have little relevance, however, because they relate to Diaz's *firing* and not the written warning or the suspension.

Diaz also accuses McNamara of engaging in discrimination when she failed to issue him a performance evaluation in January 2008. *Id.* at 9-10. Typically, employees are given reviews once a year, in order to let employees "know what they are doing well and what needed to be improved upon." R. 59 ¶ 19. According to McNamara, the reason

---

[3]Diaz also presents evidence that McNamara treated him differently than Schweig. But as the Court has explained under the indirect method analysis, Schweig is not a comparable employee because his job performance issues were not as serious as Diaz's, even when the record is viewed in Diaz's favor.

why Diaz was not given a performance review in January 2008 was because a month before that, Diaz had received a number of disciplinary warnings for failure to perform his duties. R. 55 ¶¶ 29-30. Because Diaz and his supervisors had just discussed his performance issues, reasoned McNamara, another performance review would be redundant. *Id.* ¶ 30. Diaz offers no evidence to rebut the genuineness of this explanation.

But there is one final piece of evidence that does qualify as direct evidence of race discrimination. Diaz asserts that McNamara harbored racial animus based on a comment made on or around May 22, 2008. As Diaz was walking out of the room following a disciplinary hearing, he complained to McNamara about harassment. R. 58-8 at 77. According to Diaz, McNamara said that "go[ing] to court" "didn't matter" because the School District had "plenty of money" and "good attorneys." *Id.* Diaz contends that McNamara also said, "spic, nothing's going to happen after this." *Id.* If believed by a jury, the racial epithet and the context of the racially-charged remark provide direct evidence of race discrimination.

To avoid that evidence, the School District argues that McNamara's alleged bias is irrelevant because she did not exert singular influence over the Board of Education, which approved the decision to fire Diaz. R. 54 at 10. But there are two problems with that argument. First is that the Board does not appear to be involved in the decision to impose the warning and the suspension. Second is that, since the filing of the summary-judgment motion, the Supreme Court decided *Staub v. Proctor Hospital*, 562 U.S. __, No. 09-400 (March 1, 2011). In *Staub*, the Court held that if a biased

supervisor (1) takes a step that is done for a biased reason, (2) intending to get the employee fired, demoted, or otherwise penalized, and (3) that step is found to be the proximate cause of the eventual firing, the employer will be held liable. Slip op. at 10. A jury could find that McNamara took a step that proximately caused the warning and suspension because she reviewed Diaz's performance issues before he received discipline.[4] R.55 ¶¶ 29, 36-37. In a supplemental memorandum, the School District presents three unpersuasive reasons to distinguish *Staub* . R. 68, Exh. 1 at 5-7.

First, the School District argues that, unlike *Staub*, the facts underlying Diaz's firing are verifiable by third-party witnesses. *Id.* at 5. But that difference does not affect *Staub's* holding that a biased supervisor can still infect the unbiased decisionmaker's decision with racial animus. Second, the School District argues that here, the decisionmakers conducted an independent investigation, and thus, removed any traces of discrimination by McNamara. *Id.* at 6. But *Staub* specifically explained that an independent investigation does not necessarily have preclusive effect, because the "supervisor's biased report may remain a causal factor if the independent investigation takes it into account . . . ." *Staub*, slip op. at 8-9. Third, the School District argues that there is evidence that McNamara did not engage in discrimination. R. 68, Exh. 1 at 6-7. But this does not affect *Staub's* ultimate holding: an employer is

---

[4]The School District has filed a motion for leave to file an additional memorandum based on the Seventh Circuit's recent decision in *Dickerson v. Board of Trustees of Community College District No. 522*, et al., No. 10-3381 (7th Cir. Sept. 16, 2011). R.77. That motion is granted. But for the reasons stated in the text, the evidentiary record shows that there is a genuine issue of fact over whether McNamara proximately caused Diaz's discipline.

liable for a biased supervisor's actions if that biased action is found to be the proximate cause of the firing. *Staub's* holding establishes that McNamara's bias can be imputed to the School District. Therefore, if Diaz's allegation is true, McNamara's use of the term "spic" is evidence against the School District.

Because the evidence counts against the School District, the question is whether a solitary instance of a supervisor using a racial slur is sufficient to demonstrate race discrimination. There cannot be a bright-line answer to the question, because the answer is dependent on the particular facts. For example, in an unpublished opinion, the Seventh Circuit held that a single racist remark by a supervisor – that she wanted to "fire that nigger today" – was not enough to overcome summary judgment. *Nelson v. United Parcel Service*, 337 Fed. Appx. 561, 563 (7th Cir. 2009). The Court explained that the comment was made after the firing in question and was the only evidence in the entire record of any racism.[5] *Id.*

Other cases conclude that a single incident where a supervisor utters a racial epithet may be enough to create a genuine issue on the question of discriminatory intent. *E.g.*, *Agbejimi v. Advocate Health and Hospitals Co.*, 2009 WL 2589129, at *6 (N.D. Ill. Aug. 19, 2009). In *Agbejimi*, the plaintiff learned that her supervisor said she

---

[5] The court also explained that a supervisor's racial animus could not be imputed to the employer. *Nelson*, 337 Fed. Appx. at 563 ("The comment, though reprehensible if indeed it was made, proves only that Krause referred to Nelson using a racist epithet and that she personally harbored racial animus; it does not alone prove that UPS terminated Nelson because of his race.") *Nelson*, however, was decided two years before *Staub v. Proctor Hospital*, 562 U.S. __, No. 09-400 (March 1, 2011). As described previously, there are circumstances in which a supervisor's racial animus *can* be imputed to the ultimate decisionmaker. *Supra*.

was "trying to fire the niggers." *Id.* at *2. The court rejected the employers argument that an isolated remark is not enough to overcome summary judgment, explaining that "if a jury determined Plaintiff's testimony was truthful, they could reasonably conclude, based on that testimony, that Defendant had fired Plaintiff because of her race." *Id.* at *6. And other cases have also concluded that isolated comments may constitute direct evidence of discrimination if they are contemporaneous with an adverse employment decision.[6] *E.g., Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1044 (7th Cir. 1999).

To be sure, McNamara's alleged racial slur came in May 2008, one month after the April 2008 suspension and four months after the January 2008 warnings. But that does not mean that the remark is unrelated to the discrimination claims. The racial epithet and the comment that "we have plenty of money and we have good attorneys" came *immediately* after Diaz's disciplinary hearing for his suspension. McNamara's use of a racially-offensive word at a time when Diaz was being disciplined in the employment context – even if spoken after the decisions were made – is still relevant to prove that her prior employment decisions were motivated by racial animus. Her statement cannot simply be dismissed as irrelevant. Therefore, Diaz has established enough direct evidence of discrimination to overcome summary judgment. Of course,

---

[6] Other circuits are mixed in their treatment of racial epithets. The Ninth Circuit has held that an incident where a supervisor laughs in response to a racial epithet was enough to constitute direct evidence of racial discrimination. *Chuang v. University of California Davis*, 225 F.3d 1115, 1128 (9th Cir. 2000). On the other hand, the Eleventh Circuit has held that a "supervisor's use of a racial epithet does not constitute direct evidence of discrimination." *Williamson v. Adventist Health System*, 372 Fed. Appx. 936, 940 (11th Cir. 2010).

at this stage, the Court must accept Diaz's contention that McNamara used the racial slur as described by Diaz – in order for Diaz to ultimately prevail, a jury must still conclude, after a trial, that the statement was made, that the statement proves that the suspension was motivated by discrimination, and that the School District would not have taken the same adverse action even absent McNamara's allegedly discriminatory motivation.

### B. Retaliation

Title VII also forbids retaliation against anyone who "'has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.'" *Loudermilk v. Best Pallet Co.*, 636 F.3d 312, 314 (7th Cir.2011) (quoting 42 U.S.C. § 2000e–3(a)). A plaintiff may establish her retaliation claim under the direct or indirect method of proof. *See Weber v. Universities Research Ass'n, Inc.*, 621 F.3d 589, 592 (7th Cir.2010).

"To avoid summary judgment under the direct method of proof for proving retaliation, a plaintiff must show: (1) that he engaged in a statutorily protected activity; (2) that he suffered a materially adverse action by her employer; and (3) there was a causal link between the two." *Silverman v. Board of Educ. of City of Chicago*, 637 F.3d 729, 740 (7th Cir. 2011); *see also Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 673 (7th Cir. 2011). There is no dispute that Diaz engaged in protected activity when he filed the EEOC charge or that he suffered a materially adverse action when he was suspended by the School District. But Diaz does not meet the third

19

requirement; he presents no evidence showing a causal link between the charge and his suspension. Diaz's must resort to the indirect method.

Under the indirect method of proof, two of four elements are the same as the direct-method elements: (1) he engaged in a statutorily protected activity and (2) he suffered an adverse action. *See Silverman*, 637 F.3d at 742. The parties do not dispute that Diaz satisfies these two elements. The indirect method of proof also requires Diaz to show that he met the School District's legitimate job expectations and that it treated him less favorably than similarly situated employees who did not engage in the statutorily protected activity. *See id.; Hill v. Potter*, 625 F.3d 998, 1001 (7th Cir.2010). As he did for the Title VII claim, Diaz argues that he had strong work performance and also presents a single comparator, Robert Schweig. For the same reasons discussed in rejecting the indirect method for his Title VII claim, *supra*, this evidence is insufficient to establish a prima facie case on the retaliation claims.

### C.    ADA Discrimination

Diaz also alleges that the School District discriminated against him based on his disability – diabetes. To survive summary judgment, a plaintiff must produce sufficient evidence for a reasonable trier of fact to find that (1) he was disabled within the meaning of the ADA, (2) that he is qualified to perform the essential functions of the job, either with or without a reasonable accommodation, and that (3) he suffered from an adverse employment action because of his disability. *Nese v. Julian Nordic Const.*

*Co.*, 405 F.3d 638, 641 (7th Cir.2005) (citing *Byrne v. Board of Educ., School of West Allis–West Milwaukee*, 979 F.2d 560 (7th Cir.1992)).

A plaintiff can show that he is disabled through one of three ways: (1) he has a physical or mental impairment that substantially limits him in one or more major life activities; (2) he has a record of such an impairment; or (3) his employer regarded him as having such an impairment. *Nese*, 405 F.3d at 641 (citing 42 U.S .C. § 12102(2)). Diaz has not alleged that he has an actual disability and has not provided any records of impairment, so this Court will determine whether he was "regarded as" having a disability.[7]

Under a "regarded as" claim, a plaintiff must prove that either: (1) the employer mistakenly believes the employee has a physical impairment that substantially limits a major life activity; or (2) the employer mistakenly believes that an actual, non-limiting impairment substantially limits a major life activity. *Amadio v. Ford Motor Co.,* 238 F.3d 919, 925 (7th Cir.2001) (citing *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999)); see also 29 C.F.R. § 1630.2(1). In other words, the employer "must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is

---

[7]The School District correctly points out that Type 2 diabetes is not a per se disability and that in order to show actual disability, Diaz must present specific evidence that the diabetes prevented him from performing major daily activities. R.54 at 13 n.8 (citing *Scheerer v. Potter*, 443 F.3d 916, 919-20 (7th Cir. 2006)). Diaz does not address this argument in his response brief.

not so limiting." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999); *see also Peters v. City of Mauston*, 311 F.3d 835 (7th Cir.2002).

The School District argues that no employee or supervisor ever commented on Diaz's diabetes, and thus, Diaz could not have been regarded as being disabled. R. 54 at 13 n. 8. Diaz does not respond to this argument; in fact, he does not even mention diabetes in his response brief. R. 58. Because the record reflects no evidence of any employee of the School District remarking or commenting on Diaz's diabetes, the Court concludes that there is no genuine issue: Diaz was not regarded as being disabled. Therefore, the Court grants the School District's motion with regard to the ADA claims.

### D.   FMLA

Lastly, Diaz alleges that he was fired by the School District in retaliation for exercising his FMLA rights. To succeed on a FMLA retaliation claim, "the plaintiff does not need to prove that retaliation was the only reason for her termination; she may establish an FMLA retaliation claim by showing that the protected conduct was a substantial or motivating factor in the employer's decision." *Goelzer v. Sheboygan County, Wis.*, 604 F.3d 987, 995 (7th Cir.2010) (quotation and citation omitted). As with FMLA interference claims, a plaintiff alleging a FMLA retaliation claim must establish that she was eligible for FMLA leave in the first instance. *See Daugherty v. Wabash Ctr., Inc.*, 577 F.3d 747, 750 (7th Cir.2009) ("To show a violation of FMLA rights, plaintiffs must show that they are eligible for FMLA protection"); *see also Long v. Teachers' Ret. Sys. of Ill.*, 585 F.3d 344, 350 (7th Cir.2009) ( "An employer cannot

retaliate if there is nothing for it to retaliate against.") (citation omitted). The parties do not dispute whether Diaz was eligible for FMLA leave, so the Court will only address whether the FMLA leave was a motivating factor in the School District's decision to fire Diaz.

"An employee who alleges that her employer retaliated against her for exercising her rights under the FMLA can proceed under the direct or indirect methods of proof familiar from employment discrimination litigation." *The Hope School*, 560 F.3d at 702; *Daugherty*, 577 F.3d at 751. Because Diaz cannot present a case under the indirect method for the same reasons the indirect method did not support the Title VII and ADA claims, this Court will examine the direct method.[8]

Under the direct method, the plaintiff "can survive summary judgment by 'creating a triable issue of whether the adverse employment action of which she complains had a discriminatory motivation.'" *Lewis v. School Dist. # 70*, 523 F.3d 730, 741 (7th Cir. 2008) (quoting *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 721 (7th Cir. 2005)). A plaintiff may prevail under the direct method "by 'constructing a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker.'" *Cole v. Illinois*, 562 F.3d 812, 815 (7th Cir.

---

[8] Under the indirect method, a plaintiff "must demonstrate: (1) he engaged in statutorily protected activity; (2) he met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity." *Cracco*, 559 F.3d at 634-35; *Simpson*, 559 F.3d at 718. Diaz has not presented any comparator evidence with regard to the FMLA claim. If a plaintiff does not identify a similarly-situated employee whom the defendant treated more favorably, he must proceed under the direct method. *Burnett v. LFW Inc.*, 472 F.3d 471, 482 (7th Cir.2006).

2009) (quoting *Ridings v. Riverside Med. Ctr.*, 537 F.3d 755, 771 (7th Cir. 2008)); *see also Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 633 (7th Cir. 2009) ("Under the direct method, 'proof of discrimination is not limited to near-admissions by the employer that its decisions were based on a proscribed criterion,' but rather, includes 'circumstantial evidence which suggests discrimination albeit through a longer chain of inferences.'"(citation omitted)) "The 'convincing mosaic' standard is simply shorthand for the requirement that [a plaintiff] must present circumstantial evidence that, when considered together, would permit a jury to believe that the defendants retaliated against her for exercising her FMLA rights." *Cole*, 562 F.3d at 815 n.2. "Circumstantial evidence may include suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group." *Long*, 585 F.3d at 350.

Diaz's allegation of FMLA retaliation rests on two events. First, Diaz was called in to work, on May 15, 2008, during his FMLA leave. R. 59 ¶ 24. Second, immediately upon returning to work a week later, Diaz was suspended. *Id.* ¶ 25. According to Diaz, these two events show that he was retaliated against for exercising his right to FMLA leave.

But Diaz fails to present evidence rebutting McNamara's explanation that Diaz was called back in to work during his leave because his supervisor wanted to discuss his failure to lock the school doors in April 2008. DSOF ¶ 42. McNamara stated that the reason why she called Diaz in during his leave was in order to prevent too much

time from elapsing without giving Diaz a chance to respond to the charges. *Id.* Eventually, this security breach (the failure to lock the doors) led to his suspension. And although Diaz was suspended the day after he returned from leave, "mere temporal proximity is not enough to establish a genuine issue of material fact." *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 981 (7th Cir.2004). There is an absence of evidence that any of his coworkers or supervisors ever disparaged him for taking FMLA leave. In fact, there is no indication that anyone ever reacted negatively in any way about Diaz's use of FMLA leave. Therefore, summary judgment must be granted on the FMLA claim.

## V.

For the reasons stated above, Defendant's motion for summary judgment [R. 52] is granted as to Counts 2, 3, 4, 5, 6, 7, 8, and 9, and denied as to Count 1 against School District U-46. Defendant's motion to supplement [R. 77] is granted as noted in footnote 4, *supra.* The status hearing of October 4, 2011, will remain as scheduled. The parties should be prepared to address a trial schedule, or alternatively, whether a settlement conference would be appropriate.

ENTERED:

_____
Honorable Edmond E. Chang

September 22, 2011
DATE: _____